IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

RICHARD NEELY, et al.,

                Plaintiffs,

v.                                          CIVIL ACTION NO.  2:11-cv-00444

MARK ZIMMER, et al.,

                Defendants.

MEMORANDUM OPINION AND ORDER

       Pending before the court are the Plaintiffs' Motion for Summary Judgment [Docket 51] and the Defendants' Motion for Summary Judgment, or Alternatively, for Partial Summary Judgment [Docket 53].  For the reasons discussed below, the plaintiffs' Motion for Summary Judgment is **DENIED**, and the defendants' Motion for Summary Judgment is **GRANTED**.

**I.**       **Facts and Procedural History**

       This case arises out of a fee dispute between a lawyer, a law firm, and their former clients.  On September 12, 2009, Norma Zimmer and her two sons Mark and Ronald Zimmer signed a contract of engagement with Richard Neely and the firm Neely & Callaghan.  Mr. Neely then filed an arbitration action on behalf of the Zimmers with the Financial Industry Regulatory Authority ("FINRA") in California.  In the FINRA action the Zimmers alleged that they lost money as a result of unsuitable investments.  The named respondents were the Zimmers' accountant, Randy Miller, and his firm, Miller Giagrande, LLP, the Zimmers' broker, Scott G. Sinek, and the brokerage firm, MML Investors Services, Inc. ("MML").  Although Randy Miller

and Miller Giagrande, LLP remained named respondents in the FINRA action, they did not respond to the FINRA complaint and were not signatories to the arbitration agreement.

The parties mediated their dispute on February 1, 2011.  At mediation, the Zimmers agreed to release Mr. Miller in order to ensure MML that it would not be a third-party defendant in a lawsuit brought by the Zimmers against Mr. Miller.  The day after the mediation the parties agreed on a settlement amount of $924,000.  Less than a week later, Mr. Neely dismissed the FINRA arbitration, which had been scheduled for February 2012.

On February 9, 2011, Mr. Thornton, counsel for MML, sent an email to Mr. Neely and counsel for Scott Sinek containing a settlement agreement.  Mr. Thornton wrote: "This draft has not yet been approved by my client and is subject to further change and comment by my client." (Joint Stipulation of Facts [Docket 52], at 4.)  The agreement contained a provision whereby the Zimmers released all of the named respondents of all claims.  It also contained unilateral confidentiality provisions and a non-disparagement clause.

On February 23, 2011, Mr. Thornton sent a redlined version of the February 9 draft to Mr. Neely and Mr. Sinek's counsel.  Mr. Thornton said in his email: "This is a draft document, not an offer, and is subject to review by [MML]." (*Id.*)  Mr. Neely responded to Mr. Thornton's email that same day, stating that the draft was acceptable to him.  Also on that day Ron Zimmer emailed Mr. Neely and said: "I see nothing in the draft that protects us!  Will send some ideas soon." (*Id.* at 5.)  Mr. Neely responded with: "Leave it be.  We don't need protection; we get money.  That's how it works.  Take it from me!" (*Id.*)

Mr. Neely wrote to Ron Zimmer again the next day, stating:

> I decided that if possible you shouldn't end up paying some big firm mega-bucks to micro-manage the release so I called William Thornton at Stevens and Lee and asked if he could include "mutual release" language in the release.  He didn't seem opposed, but said he "would discuss it with his clients."  I also indicated that

we would also want mutual release language from Scott Sinek.  We'll see how much screw-around this entails.

(*Id.*)  On March 4, 2011, Mr. Neely sent Ron Zimmer a revised settlement agreement.  The revised agreement contained a release of the Zimmers from the FINRA respondents, but it did not include signature blocks for many of the releasing entities.  It also did not include a mutual release as to Randy Miller and Miller Giagrande, LLP.  In addition, it did not include mutual confidentiality and non-disparagement clauses.  Finally, it did not make the general release of unknown claims mutual as to the Zimmers.  On March 6, Ron Zimmer responded to Mr. Neely; commenting on the draft agreement, he stated: "We should have mirrored protection, both claimants, and Respondents identical in releases and Confidentiality agreements. . . .  Simple: anyone we release, they also need to release us!"  (*Id.* at 5-6.)

The next day Mr. Neely sent an email to Ron Zimmer, which stated:

I'm sorry but I can't continue to handle this case.  You may have noticed that I send you things at night and on weekends.  I thought that this case was over, and that is how I budgeted my time.  Right now I represent two families of miners killed in the Upper Big Branch mine disaster in Boone County, West Virginia.  Massey Energy has just had executives indicted for obstruction of justice and withholding evidence.  Both of these cases are ten million dollar cases and I am the senior lawyer on the case and do the heavy lifting in terms of crafting legal theories.

You obviously no longer trust me.  I tell you there are standard ways of handling these cases and that there is ABSOLUTELY NO POSSIBILITY that anyone will ever sue you or do anything else either with or without these releases.

You told me that you have hired another lawyer out there, so please have him contact my office to get the contact information for the lawyers on the other side.  Also, you will probably need to have him put this case back on the arbitration docket because all this quibbling will give the other side an opportunity to decline to pay.

I'm sorry but I must work on other matters and this problem was entirely unbudgeted in my practice.

I was happy to take this case as a favor to Jeffrey and I really love your mother,

but I can't work under these conditions.

(J.A. [Docket 54], at 215-16.)   Mr. Neely also wrote to Norma Zimmer.   He said:
"Unfortunately, I have asked Ron and Mark to use Ron's California lawyer to close our case
against MML and Sinek up.   Apparently Ron and Mark have lost confidence in me."   (*Id.* at
212.)

Norma Zimmer passed away in the spring of 2011.   In June 2011, Mr. Neely emailed
Mark and Ron Zimmer.   He gave his condolences to them on the passing of Norma Zimmer.
Additionally, Mr. Neely said:

> If, then, there is no real possibility of a successful suit against Randy Miller, I
> suggest that we agree to sign the Release as originally drafted by Mr. Thornton
> for MML and negotiated by me to provide a mutual release and be done with it.
> In this last regard, I shall be happy to take the case back over and inform Mr.
> Thornton that we either go through with the settlement to which we originally
> agreed or I shall refile the case with FINRA.

(*Id.* at 264.)   Mr. Neely also asserts that he "entirely fulfilled" his obligation under the contract
by litigating "the case to a successful conclusion."   (*Id.* at 265.)   Mr. Neely concluded by stating:
"I shall be happy to attempt to conclude this settlement on its original terms."   (*Id.*)

The Zimmers did not take Mr. Neely up on his offer and retained the firm Greenberg
Traurig, LLP to represent them in the FINRA action.   Ultimately, the parties to the FINRA
action altered the settlement agreement's language so that the Zimmers no longer released Randy
Miller.   In exchange, the Zimmers put $150,000 of the settlement money into escrow in the event
that they are sued by Mr. Miller.   In addition, the Zimmers will be required to put an additional
$100,000 in escrow if Mr. Miller sues the FINRA respondents.   The Zimmers will receive this
$250,000 unconditionally if they obtain a California court order that MML's and Mr. Sinek's
settlement with the Zimmers was in good faith.   If they receive this order, MML and Mr. Sinek
will be insulated from being third-party defendants in a suit that the Zimmers bring against Mr.

4

Miller.

On June 21, 2011, Mr. Neely filed the instant complaint. The complaint brings two counts for assumpsit and trespass. The defendants filed a motion to dismiss for lack for personal jurisdiction, for failure to state a claim or, alternatively, to transfer venue. This motion was denied on October 28, 2011. Thereafter, the defendants answered the complaint and asserted a breach of contract counterclaim. On April 24, 2012, the parties filed motions for summary judgment, and the court held a hearing on these motions on June 11, 2012.

## II.    Summary Judgment Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion.  *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds*, 490 U.S. 228 (1989).

### III.   Discussion

At the summary judgment hearing I asked Mr. Neely whether it is fair to construe his complaint as constituting a breach of contract claim, and Mr. Neely responded that the complaint could be construed in this manner.  Next, I asked Mr. Neely whether he makes a claim for *quantum meruit* relief.  Mr. Neely denied that he has made or intends to make such a claim because he argues that Neely & Callaghan completely fulfilled its contract.  Accordingly, the court must determine whether Mr. Neely and the firm Neely & Callaghan performed under the contract of engagement, entitling them to the contingency fee.[1]

An attorney fulfills his or her obligation under a contingency fee contract when the "contingency" has occurred.  *See* 7A C.J.S. *Attorney & Client* § 400 (2012); *Sellers v. City of Summerville*, 67 S.E.2d 137, 141-42 (Ga. 1951); *see also Matheny v. Farley*, 66 S.E. 1060, 1060 (W. Va. 1910) ("The general rule of law is that when a contract for service is entire, for a given sum, full performance of the contract is a condition precedent to the right to recover the stipulated compensation.").  When the contract does not state what the contingency is, the contingency is sometimes said to be a binding settlement or judgment.  *See McCullough v. Waterside Assocs.*, 925 A.2d 352, 357 (Conn. App. Ct. 2007) ("[B]y continuing to represent the defendants through the settlement, the plaintiff fully performed his obligation under the agreement, which was to represent the defendants to the completion of the lawsuit or to

---

[1] The parties did not brief the issue of whether California or West Virginia law applies.  However, the result under both states' law is the same.

6

settlement."). The weight of authority, however, holds that absent a contrary agreement, the contingency includes receipt of the award or settlement by the client. *See Dardovitch v. Haltzman*, 190 F.3d 125, 139-40 (3d Cir. 1999); *Camden Nat'l Bank v. Steamship Navigation Co.*, 991 A.2d 800, 803 (Me. 2010); *Four Winds, LLC v. Smith & DeBonis, LLC*, 854 N.E.2d 70, 75 (Ind. Ct. App. 2006); *Mrozinski v. Marinello*, 260 N.Y. S.2d 199, 202 (Sup. Ct. 1965); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 35. This majority rule comports with our common sense understanding that the contingency fee is taken out of the client's recovery. The recovery provides the source of the attorney's fee, so the client must receive the award or settlement in order to pay the fee. *See Valparaiso Tech. Inst. v. Porter Cnty. Treasurer*, 676 N.E.2d 416, 420 (Ind. Ct. App. 1997) ("A true 'contingent fee' has two components: (1) payment is contingent on the outcome, and (2) the fee is a percentage deducted from the client's recovery.").

This rule makes sense in light of the purposes of contingency fee arrangements. Contingency fees enable individuals to obtain legal representation who otherwise could not afford it. To allow an attorney to collect the contingency fee prior to receipt of the award or settlement, absent an express agreement, would discourage individuals from seeking representation out of fear that they would lack an adequate source of funds to compensate the attorney. "In the typical contingent fee arrangement, attorneys in effect insure their clients and themselves against the cost of losing by covering those losses with higher-than-normal fees in winning cases." *Ausler v. Ramsey*, 868 P.2d 877, 881 (Wash. Ct. App. 1994). These arrangements have drawbacks for both parties—clients' awards are reduced significantly and attorneys risk minimal or no recovery. *Id.* "This may occur because a client wants to go to trial or appeal a case that the attorney has come to believe will be unsuccessful." *Id.* Despite this

limitation on recovery of the contingency fee, not all is lost for attorneys in contingency fee arrangements. *Quantum meruit* relief ensures that in appropriate circumstances an attorney is compensated for the work performed that benefits the client.[2]  In this case, however, Mr. Neely did not assert a claim for *quantum meruit* relief, and therefore the court is limited to considering whether the plaintiffs are entitled to their contractual fees.

The court is also guided by the principle that when a contract is ambiguous, it should be construed against its drafter.  *Duncan v. McCaffrey Grp., Inc.*, 133 Cal. Rptr. 3d 280, 306 (Cal. Ct. App. 2011); *Nisbet v. Watson*, 162 W. Va. 522, 530 (1979).  This principle applies with even greater force here, where the contract was drafted by an attorney to govern the relationship between the attorney and client.  "[L]awyers are more able than most clients to detect and clarify omissions in client-lawyer contracts because lawyers almost always write such contracts and are more familiar with the intricacies of legal representation and with the law and drafting of fee agreements and other contracts."  *Levine v. Bayne, Snell & Kruase, Ltd.*, 40 S.W.3d 92, 95 (Tex. 2001) (internal quotation marks omitted).

The above authority leads me to conclude that absent an agreement to the contrary, the contingency must at the very least be a binding settlement or judgment, and probably includes receipt of the award or settlement.  Accordingly, the court must first determine whether the parties agreed to an alternative contingency.  Mr. Neely seems to suggest that his sole obligation

---

[2] The West Virginia Supreme Court of Appeals, in *Cardot v. Luff*, explained that: "before an attorney can unilaterally sever the attorney-client relationship, he must give reasonable notice to his client of his intention to withdraw.  If the withdrawal involves a matter pending in court, there is the further requirement that the attorney secure court permission for his withdrawal." 164 W. Va. 307, 307 (1980) (internal citations omitted).  Moreover, if a lawyer withdraws for good cause, he can recover in *quantum meruit* for the services performed. *May v. Seibert*, 164 W. Va. 673, 681 (1980).  "If a lawyer withdraws without good cause, but follows the procedure outlined in Cardot v. Luff, supra, and there is no resultant prejudice to the client, the attorney should be permitted to show the court the benefits which his work conferred on the client."  *Id.*  In California, an attorney discharged with or without cause can recover in *quantum meruit*. *Francasse v. Brent*, 494 P.2d 9, 14-15 (Cal. 1972).  An attorney retained on the basis of a contingency fee agreement who withdraws from the case can only recover in *quantum meruit* if the attorney has "justifiable cause" for withdrawal. *Estate of Falco v. Decker*, 233 Cal.Rptr. 807, 813 (Cal. Ct. App. 1987).

under the contract was to bring the parties to an agreement as to the settlement amount—even if other factors prevented the parties from entering into a binding settlement agreement.  He points to the parties' stipulation that "At no time from the outset of the case, did any of the Zimmers instruct Mr. Neely that he was engaged to obtain anything but monetary relief."   (Joint Stipulation of Facts [Docket 52], at 3.)  As a result, Mr. Neely claims that he "performed all of the services for which he was hired: Failure by the Zimmers to receive their entire $924,000 on 8 April 2011 was entirely the Zimmers' own fault."  (Pls.' Mot. Summ. J. [Docket 51] at 13.)

The contractual language does not support Mr. Neely's argument.  It states: "You have agreed to retain Neely & Callaghan on contingent fee of thirty-three and a third percent (33 1/3 percent) and further to advance all out-of-pocket expenses of this litigation." (Compl. [Docket 1-1] Ex. 1, at 13.)  In addition, the contract provides that "Neely & Callaghan's fee will be calculated upon the gross amount of the award before the repayment of expenses to the parties who have advanced those expenses."  (*Id.* at 14.)  Nothing in the contract indicates that Neely & Callaghan is entitled to its contingent fee once the parties have agreed to a settlement amount but before the settlement is enforceable and the funds are received.

Without an agreement to the contrary, Mr. Neely must at the very least show that the parties reached a binding settlement as of March 7, 2011—the day that Mr. Neely wrote to the Zimmers and said, "I'm sorry but I can't continue to handle this case."  (Joint Stipulation of Facts [Docket 52], at 6.)     At that time, the parties had agreed on a settlement amount of $924,000, and they had exchanged a few drafts of an agreement.  During these exchanges, Mr. Thornton stated: "this draft has not yet been approved by my client and is subject to further change and comment by my client" and "this is a draft document, not an offer, and is subject to review by [MML]." (*Id.* at 4.)  Ron Zimmer also voiced his objections to the release provisions,

writing to Mr. Neely on March 6 that the parties "should have mirrored protection, both claimants, and respondents identical in releases and confidentiality agreements." (*Id.* at 5-6.)

Settlement agreements are construed as any other contract. *In re Tobacco Cases I*, 111 Cal. Rptr. 3d 313, 317 (Cal. Ct. App. 2010); *Triad Energy Corp. of W. Va., Inc. v. Renner*, 215 W. Va. 573, 576 (2004). There must be a meeting of the minds on all material terms. *Burch v. Premier Homes, LLC*, 131 Cal. Rptr. 3d 855, 868 (2011); *Triad Energy Corp. of W. Va., Inc.*, 215 W. Va. at 576. In addition, release provisions in settlement agreements are often considered material. *See Nussbaum v. Corlyn*, No. B222102, 2011 WL 5042283, at *4 (Cal. Ct. App. Oct. 25, 2011) ("The material terms of the settlement here were the $375,000 payment, the releases, and the dismissals of the various legal proceedings."); *Zemer v. Schreiber*, No. D053024, 2009 WL 3154970, at *12 (Cal. Ct. App. Oct. 1, 2009) ("The 'scope of release' has been identified as a material term of some settlement agreements."); *Triad Energy Corp. of W. Va., Inc.*, 215 W. Va. at 577 (finding that a release provision was an additional material term); *Riner v. Newbraugh*, 211 W. Va. 137, 144 (2002) (same).

As of March 7, 2011, there is no evidence in the record that there was mutual assent as to the material terms of a settlement agreement. As evidenced by Ron Zimmer's March 6 email to Mr. Neely, the Zimmers had not agreed to the proposed release terms. In addition, the parties had not signed any draft agreement that had been circulated up to that time. And the emails sent by Mr. Thornton underscore the parties' lack of assent to the material terms of the agreement. Accordingly, I **FIND** that Mr. Neely has failed to produce more than a scintilla of evidence that the parties had reached a binding settlement agreement as of the date he ceased representation of the Zimmers. Additionally, there is no dispute that when Mr. Neely ceased representation, the Zimmers had not received any money from the FINRA respondents.

The relationship between Mr. Neely and the Zimmers also did not end prematurely as contemplated by the contract of engagement.  The contract provides two ways in which the parties could terminate their relationship prior to the occurrence of the contingency.  First, it states:

> You agree that Neely & Callaghan will represent you until such time as Neely & Callaghan, in their absolute, total, sole and unfettered discretion determine that the claim either cannot be sustained or can be sustained only at an expense that would exceed any reasonably foreseeable recovery.  In the event that further investigation reveals to Neely & Callaghan that there is a low likelihood of prevailing on the claim or of prevailing only at a cost that would exceed the claim, Neely & Callaghan may withdraw from representation and upon doing so will cooperate with successor counsel, if any, in the orderly transfer of the case and its attendant file.  Should this occur, you will owe Neely & Callaghan nothing other than any unpaid out-of-pocket expenses.

(Compl. [Docket 1-1] Ex. 1, at 14.)  Second, the contract explains that:

> In the event that irreconcilable differences arise between you and Neely & Callaghan for any reason, Neely & Callaghan agrees to cooperate with any successor attorney and effect an orderly transfer of the case.  You agree that if differences arise and you wish to discharge Neely & Callaghan over their objection, you will compensate Neely & Callaghan for work performed at the rate of $500 per hour for actual litigation work, including by way of example, investigation, drafting documents, reviewing accounts, and working with arbitrators, and at $100 per hour for travel time.

(*Id.*)  The first provision does not apply because the plaintiffs never assert that they believed that there was "a low likelihood of prevailing on the claim or of prevailing only at a cost that would exceed the claim."  Turning to the second provision, the plaintiffs' briefs at times suggest that Mr. Neely and the firm claim to have been constructively discharged.  This constructive discharge allegedly arose from the fact that the Zimmers sought advice from attorneys at Greenberg Traurig, they allegedly did not follow Mr. Neely's objectively reasonable advice, and they allegedly "behaved in such a way that Plaintiff reasonably knew that they planned somehow to torpedo the settlement."  (Pls.' Mot. Summ. J. [Docket 51], at 12.)  Even if Mr. Neely and

Neely & Callaghan were discharged, they would not be entitled to compensation under the contract.  The contract provides that: "if differences arise and you wish to discharge Neely & Callaghan *over their objection*, you will compensate Neely & Callaghan for work performed at the rate of $500 per hour."  There is no evidence in the record that Mr. Neely and the firm objected to being discharged—in fact Mr. Neely's letter to the Zimmers on March 7 stated that he could no longer represent them.  Accordingly, I **FIND** that neither provision of the engagement contract applies to the instant dispute to entitle Mr. Neely and Neely & Callaghan to compensation.  In conclusion, because there is no genuine issue as to any material fact and the defendants are entitled to judgment as a matter of law, I **GRANT** the Defendants' Motion for Summary Judgment [Docket 53] and **DENY** the Plaintiffs' Motion for Summary Judgment [Docket 51].

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: August 2, 2012

Joseph R. Goodwin, Chief Judge

12